NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The ELECTRIC FURNACE CO. and Sa-
lem Fabricating & Machine Co.,
Respondents.

No. 15297.

United States Court of Appeals
Sixth Circuit.

Feb. 11, 1964.

Paul J. Spielberg, N.L.R.B., Washing-
ton, D. C., for petitioner, Stuart Roth-
man, Gen. Counsel, Dominick L. Manoli,
Assoc. Gen. Counsel, Marcel Mallet-Pre-
vost, Asst. Gen. Counsel, Elliott Moore,
Atty., N.L.R.B., Washington, D. C., on
the brief.

John J. Adams, Cleveland, Ohio, for
respondents, Ronald L. Coleman, Squire,
Sanders & Dempsey, Cleveland, Ohio, on
the brief.

Before MILLER and PHILLIPS, Cir-
cuit Judges, and McALLISTER, Senior
Circuit Judge.

PHILLIPS, Circuit Judge.

The National Labor Relations Board
has filed a petition for enforcement of its
order against respondents, The Electric
Furnace Company (hereinafter referred
to as "Electric Furnace" or "The Com-
pany") and Salem Fabricating and Ma-
chine Company (hereinafter referred to
as "Salem").

The Company began a bargaining relationship with the United Steel Workers of America, AFL-CIO, District 26, Sub-District No. 5 (hereinafter referred to as the "Union"), after the Union was certified to represent the Company's employees in 1950. Collective bargaining agreements were entered into in 1951, 1952, 1954 and 1956. The last such agreement expired November 14, 1959.

Electric Furnace is primarily an engineering company, marketing its products on a world-wide basis. It designs, manufactures and installs heat treating equipment. Salem was established on January 2, 1959, as a wholly-owned subsidiary of Electric Furnace, to carry on the manufacturing processes formerly done by the Company. Salem assumed the contract between Electric Furnace and the Union. Salem proved to be an unprofitable venture, however, and on August 16, 1960, was merged into Electric Furnace, thereupon ceasing to be a legal entity.

Following the expiration of the last collective bargaining agreement on November 14, 1959, the Union won a subsequent election and was recertified on January 25, 1960. At the time of the election all of the original bargaining unit of 130 employees were eligible to vote, but approximately 100 of them were in a laid-off status due to lack of work. After the recertification, Salem and the Union commenced active negotiations for a contract. By March 1960 only twenty former bargaining unit employees were still working for Salem, a reduction of 110.

When Salem discontinued operations and was dissolved in mid-August, 1960, the number of employees in the bargaining unit had been reduced, due to economic reasons, from 130 to approximately twenty-three. The legality of these discharges is not questioned. Of these twenty-three employees, thirteen were former supervisors and clerical employees who were not part of the original unit but had been transferred to the production force because of economic necessity. When Salem was dissolved, Electric Furnace again employed these twenty-three employees, recognized the Union as their bargaining representative and continued negotiations.

The first meeting was held on September 8, 1960, at which time the Union requested certain information concerning a pension plan established by the Company in 1951. The plan covered all of the Company employees and had at all times been financed solely by the Company. The Union requested copies of the pension plan and the pension trust agreement, and full information concerning the employees who had acquired pension rights. The Company gave the Union a list of the names of employees who were eligible for pensions, but refused to furnish copies of the Pension Plan and Pension Trust Agreement.

On October 21, 1960, the Union filed an unfair labor practice charge to the effect that the action of the Company in refusing to furnish a copy of the pension plan constituted a refusal to bargain in good faith. A complaint was issued on January 6, 1961, in Case No. 8–CA–2272, upon the ground that, by refusing to furnish the requested documents and information, the Company violated §§ 8(a)(5) and 8(a)(1) of the Act. Two weeks after receiving the complaint, the Company furnished to the Union all the information that originally had been requested: that is, complete data about the employees eligible for pensions and copies of the pension plan and pension trust agreement. Upon receipt of this information the Union withdrew its charge with the approval of the Regional Director who, in turn, dismissed the complaint.

A bargaining session previously had been scheduled for February 10, 1961. On January 25, 1961, the Union's certification year expired and on January 31 the Company filed a representation petition with the Board, alleging its doubt as to the majority status of the Union. On February 8, 1961, the Regional Director issued a notice of hearing on this petition, and set a hearing for February 20. On February 9 the Company wrote a letter to the Union cancelling the meet-

ing which had been set for the next day, saying it could not meet in the light of the pending representation question. On February 10, the Union filed a charge alleging a refusal to bargain.

On May 5, 1961, the Regional Director issued a complaint based on this latter charge, Case No. 8–CA–2355. On the same day, the Regional Director retracted his withdrawal of the charge and dismissal of the complaint in the earlier Case No. 8–CA–2272, and reinstated the charge and complaint in that case. He then issued an order consolidating Case No. 8–CA–2272 and Case No. 8–CA–2355 for hearing. Also on the same day, May 5, the Regional Director dismissed the Company's representation petition.

The Trial Examiner recommended that the complaint be dismissed in its entirety. He held that: the refusal of the Company to furnish the requested information could not be held to be a violation of the Act because the information thereafter was furnished and the charge had been withdrawn and the complaint dismissed; that the contention of the General Counsel that the Company's refusal to furnish the pension fund information caused the Union's majority status to be dissipated "is obviously without merit as there is not a scintilla of evidence to substantiate this nor is there any proximate relationship between the asserted cause and the alleged consequence"; and that, with the expiration of the certification year, the Company had the right, in view of its doubts concerning the Union's majority status, to ask for a new election and thereafter refuse to bargain.

The Board reversed the Examiner and found that the Company violated § 8(a)(5) by refusing to furnish the pension information, and further violated § 8(a)(5) by refusing to meet with the Union on February 9, 1961; and issued a cease and desist order. Affirmatively the Board ordered the Company to continue to bargain with the Union as the exclusive representative of the employees in the unit and to post the customary notices.

The decision and order of the Board are reported at 137 N.L.R.B. No. 120. We find that the initial charge concerning the failure of the Company to furnish the requested pension plan information was barred by the six-month statute of limitations prescribed by § 10(b) of the Act, 29 U.S.C. § 160(b); and that the Company was not required to continue to bargain after one year from the certification of the Union when the Union had lost its majority status and a notice of a hearing had been issued by the Regional Director pursuant to a representation petition. We deny enforcement of the order of the Board.

Section 10(b) of the Act provides, in pertinent part, that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made." 29 U.S.C. § 160(b).

This section, which has the effect of a statute of limitations, would clearly prevent a complaint issued in May, 1961, from alleging an unfair labor practice committed in September, 1960. Here, however, the problem is not quite so simple. A timely complaint had been issued on January 7, 1961, but subsequently the charge was withdrawn and that complaint dismissed. Then on May 5, 1961, eight months after September 8, 1960, the Regional Director attempted to retract his withdrawal and reinstate this earlier timely charge. We are of the opinion that his action in doing so is barred by § 10(b). The Board has held that a withdrawn charge cannot support allegations of unfair labor practices, and to allow its reinstatement would circumvent the meaning of § 10(b). Olin Industries, Inc., 97 N.L.R.B. 130; Square D Company, 105 N.L.R.B. 253. See Local Lodge No. 1424, International Association of Machinists v. N.L.R.B., 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832; Wausau Bldg. & Constr. Trades Council, 123 N. L.R.B. 1484. Thus after the January 7 complaint had been withdrawn and dismissed, it could not be reactivated after the statutory six-month period of limitations had expired.

■ The Board argues that the May 5, 1961, complaint, if not effective to reinstate the earlier charge, was at least valid as of May 5 and therefore reached back six months to November 5, 1960. The Board then contends that the refusal to furnish the pension information on September 8, 1960, was a continuing violation up to January 24, 1961, when the information was eventually furnished. It is argued that this continuing violation carried over into the six months prior to the complaint of May 5, 1961, and thus that complaint supports the finding of a refusal to bargain. We cannot accept this reasoning. The Company's refusal to furnish the requested information occurred on September 8. To hold that this act continues indefinitely in the absence of further requests by the Union and under the circumstances here involved would do violence to § 10(b) and would render this provision of the Act virtually impotent. Local Lodge No. 1424, International Association of Machinists v. N.L.R.B., 362 U.S. 411, 80 S. Ct. 822, 4 L.Ed.2d 832; N.L.R.B. v. Lundy Mfg. Corp., 286 F.2d 424 (C.A.2); American Federation of Grain Millers v. N.L.R.B., 197 F.2d 451 (C.A.5).

To bolster its argument of a continuing violation, the Board asserts that during this five-month period a Union representative "was making monthly appeals to respondent to change its position, but without success," implying that the Union made new requests every month for the pension information. We find no evidence on the record to support such an implication. A Union representative testified as follows: "I believe about once a month I would call Mr. Coe on the telephone and inquire as to whether a meeting would be of any value, and he took the position over the telephone, that was a phone conversation, unless the position had changed he could see no further reason to hold a meeting." This was the extent of the contacts between the parties from September 1960 to January 1961 and we find this testimony not to be sufficient to support the proposition that the Company refused anew each month to furnish the pension information.

■ The record does not establish that the refusal of the Company to furnish the pension information was the cause of the failure of the parties to reach an agreement. To the contrary there was testimony to the effect that as early as March 1960 both the Company and the Union had taken firm positions on other issues presented by a series of offers and counter-offers, and that neither was willing to yield further.

We do not hold that a refusal to bargain or a refusal to furnish information to which a Union is entitled as bargaining representative of employees may not be a continuing violation. We simply hold the Company's refusal on September 8 to furnish certain pension information did not, under the facts of this case, constitute a continuing refusal to bargain.

Therefore, the charge that the Company violated § 8(a) (5) on September 8, 1960, is barred by § 10(b) and the Board's order based thereon must be set aside. It therefore is not necessary for this Court to pass upon the question of whether the Company's refusal to furnish this pension information constituted a refusal to bargain, in violation of § 8 (a) (5).

Upon the expiration of the certification year the Company filed a representation petition and refused to meet with the Union while this proceeding was pending. The Board overruled the Trial Examiner and found that the Company's action constituted a refusal to bargain in violation of § 8(a) (5), and, as a remedy, ordered the Company to continue bargaining with the Union.

■ If an employer has well-founded doubts about a Union's majority status, and no unfair labor practice on the part of the employer has caused this loss of majority, the employer may, at the end of the Union's certification year, refuse to bargain further with the Union. Brooks v. N.L.R.B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; N.L.R.B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (C.A.2); N.L.R.B. v. Minute Maid Corp., 283 F.2d 705 (C.A.5); Stoner Rubber

Co., 123 N.L.R.B. 1440; Celanese Corp. of America, 95 N.L.R.B. 664.

Here the Company has satisfied both of the conditions attached to this rule. First, it did not commit an unfair labor practice causing the Union's loss of majority; it was economic necessity, and not an unfair labor practice, which required the discharge of nearly all of the employees in the bargaining unit; secondly, the Company's doubts about the Union's majority status were more than justified. Almost all the members of the original bargaining unit had been discharged. The situation had changed to such an extent that former supervisors and clerical employees now constituted a majority of the unit. The Union's loss of majority is conclusively demonstrated by the fact that twenty of the twenty-three employees remaining in the bargaining unit testified before the Examiner that they would not want to be represented by the Union. The record shows that no dues were paid by any employees to the Union after May 1960.

Further, after the Company filed its representation petition, the Regional Director issued a notice of hearing on the petition. This indicates that the Regional Director was of the opinion that a serious representation question existed. See Brooks v. N.L.R.B., 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125; Henry Heide, Inc., 107 N.L.R.B. 1160, 1163, enf. 219 F.2d 46 (C.A.2). The Company clearly was justified in refusing to bargain while this situation continued.

On this point the Trial Examiner ruled as follows:

"Moreover, it would seem evident that when the Respondent filed a representation petition and the Regional Director issued a formal notice of hearing that this indicated he believed there was a real question whether the Union represented a majority of the employees in the designated bargaining unit. * * When Respondent received notice from the Regional Director on February 9, 1961, that a formal hearing on its petition would be held, it was reasonable for Respondent to assume that the Regional Director's investigation had satisfied him that there was cause to believe that a real question of representation existed. It was then incumbent for the Respondent to assume a posture of complete neutrality which encompassed not bargaining with the Union until a final determination was made. If Respondent had acceded to the Union's request to enter into bargaining negotiations, it would have been acting at its peril and would have assumed the risk of being found in violation of the Act, regardless of its good faith, if the Board were to ultimately find that a question of representation really existed."

The Company might have been held guilty of violating the Act if it had bargained while the representation petition was pending. International Ladies' Garment Workers' Union v. N.L.R.B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762; N.L.R.B. v. National Container Corp., 211 F.2d 525 (C.A.2); North Electric Co., 129 N.L.R.B. 675; Shea Chemical Corp., 121 N.L.R.B. 1027; Midwest Piping and Supply Co., 63 N.L.R.B. 1060.

In this situation, the Company's refusal to bargain on February 9, 1961, was justified and therefore was not a violation of § 8(a)(5). Since the certification year has expired, and there is a substantial question concerning the Union's majority status, no useful purpose will be served by requiring the Company to continue to bargain unless and until the Union is certified again as bargaining representative following a new election. See Perry Coal Co. v. N.L.R.B., 291 F.2d 126, 128 (C.A.7); N.L.R.B. v. Superior Fireproof Door & Sash Co., supra.

Enforcement of the Board's order is denied.